719 P.2d 1077

Ann Lewis HIGDON, formerly Marilee Ann Lewis, Plaintiff/Appellee,

v.

EVERGREEN INTERNATIONAL AIR-LINES, INC., an Oregon corporation, doing business in the State of Arizona, Defendant/Appellant.

No. 2 CA–CIV 5238.

Court of Appeals of Arizona, Division 2, Department A.

July 11, 1985.

Bolding & Zavala by Michael O. Zavala, Tucson, for plaintiff/appellee.

Lewis & Roca by Susan M. Freeman and Richard S. Cohen, Phoenix, for defendant/appellant.

BIRDSALL, Presiding Judge.

Our first decision in this case, *Higdon v. Evergreen International Airlines, Inc.,* 138 Ariz. 172, 673 P.2d 916 (App.1982) was vacated by the Arizona Supreme Court in *Higdon v. Evergreen International Airlines, Inc.,* 138 Ariz. 163, 673 P.2d 907 (1983). Although the supreme court found, as did this court, that the trial court had made certain erroneous conclusions of law requiring reversal, the case was remanded for further proceedings in the trial court.

The erroneous conclusion in the trial court was that job-related experience could not be considered as a "factor other than sex" to constitute an affirmative defense of the employer in a sex discrimination action. Our supreme court held that in order to sustain its burden, the employer must (1) show that use of a factor which creates a wage disparity is business related, and (2) show that use of the factor is reasonable in light of the employer's stated purpose as well as its other practices.

The trial court had rejected certain findings of fact proposed by the employer following the court trial. These were:

"1. The defendant has met its burden of rebutting plaintiff's prima facie case by showing the wage differential was due to a factor other than sex, and the plaintiff has failed to show the other factors were mere pretext;

2. Defendant has shown that there were valid business reasons for the wage disparity, and that the experience of Gary Williamson was important as an economic consideration for the defendant;

\*　　\*　　\*　　\*　　\*　　\*

4. The job at issue when Gary Williamson was assigned to it required substantial breadth and scope of experience in order to set up the department." 138 Ariz. at. 167, 673 P.2d at 911.

The record in the original appeal did not show whether these findings were rejected because of the erroneous legal conclusions or because they were not supported by the evidence. The supreme court therefore applied the rule "that where findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue." The court then explained,

"We cannot determine whether the trial judge rejected the submitted findings because they were not supported by the evidence or whether he rejected them because they were not material under the legal theory adopted by the trial court. Under such circumstances a remand appears to be the proper course." 138 Ariz. at 167, 673 P.2d at 911.

On remand the trial court received no additional evidence and, after considering memoranda and oral argument, held, in effect, that the foregoing findings were rejected because they were not supported by the evidence. Judgment was then again entered in favor of Higdon.

On appeal we must review the record and determine whether the trial court's findings were clearly erroneous. We find that the refusal to make the foregoing findings was clearly erroneous. We reverse and remand with directions to enter judgment for Evergreen.

The record clearly shows that the wage differential between the male employee, Gary Williamson, and his female replacement, the appellee, Ann Lewis Higdon, was due to the vast difference in their job-related work experience. This is a lawfully recognized factor other than sex. The evidence further shows that there were valid business reasons for hiring someone with Williamson's experience and that this was important as an economic consideration of Evergreen. No evidence suggests that this factor was a mere pretext.

The following facts are repeated verbatim from the supreme court opinion in *Higdon*, supra, at 138 Ariz. 164–65, 673 P.2d 908–09.

"In January, 1976, appellant Evergreen was a small commercial airline in Marana, Arizona with about fifty employees. Gary Williamson was hired as a salesman in marketing operations in early 1976. He later became marketing manager for Evergreen at a salary of approximately $1100 per month.

Evergreen experienced rapid growth during 1976. It became necessary to create a passenger service department to provide for the convenience and comfort of passengers. Williamson was made its director in January, 1977, at his same salary. Evergreen's passenger business was charter flights, which required it to have 'station managers,' either employed or by contract, in most of the terminals which it used.

Williamson's new position required him to travel extensively to various terminals to hire, train and supervise station managers; secure office space; contract with other companies; mark and handle luggage; and receive and adjust customer complaints.

In April, 1977, appellee was employed as Williamson's secretary assistant at a salary of $500 per month. When Williamson resigned in February, 1978, appellee replaced him and was given a $200 per month raise, making her salary as director of the passenger services department $700 per month. Williamson's salary at the time of his resignation was $1183. From the date she was hired, until her resignation a year and one-half later, appellee was given one $56 per month raise.

Williamson's experience prior to his employment with Evergreen included 11 years with Continental Airlines, beginning as a customer service representative and ending as a sales manager. He also worked for Gray Line Tours holding

two different positions as travel agency manager and as sales manager. Appellee's prior work experience included 6 months as a flight attendant, 7 years as a dental assistant and several secretarial positions."

The evidence also shows in greater detail that Williamson began working for Continental Airlines in February 1963 as a customer service representative. In this capacity, he worked the airline ramps, loaded and off-loaded aircraft, passengers, and cargo, assisted in parking aircraft, and worked ground equipment. He worked as a customer service representative for approximately eleven months and then transferred laterally and worked as a customer service agent in Kansas City. Next, he worked as an airport sales agent. He was later promoted to service supervisor, supervising agents at the ticket counter. In this position, he was called upon to handle extreme problem situations. At Continental, this was a training job in preparation for further promotion.

After working as Continental's service supervisor for approximately six months, Williamson was promoted to director of passenger services at Continental's Los Angeles station. In that capacity he served as the "arm of management" on board Continental flights. All flight attendants reported to him and he had responsibility for the passengers' general satisfaction and service, and for catering operations. He also wrote tickets while on board the airline, maintained flight coupons and turned them into passenger accounts and attempted to sell additional bookings with Continental. Williamson flew domestically in this position for approximately 18 months; thereafter, he flew for approximately six months on military or contract flights, upon which he was responsible for all customs documentation. In total, he served as Continental's director of passenger services at Los Angeles for approximately two years.

In 1967 Williamson transferred to Houston as supervisor of Continental's ticket counter. There he had responsibility for all ticket agents and for passenger handling. He worked in that job for approximately one year. In 1968, he became Continental's reservations supervisor, in charge of the company's reservations sales agents, and worked in that capacity for approximately one year. He was then promoted to sales representative. In this job, Williamson was required to call on commercial accounts and travel agents, present demonstrations on tour packages to groups or travel agents, and construct travel shows. He was required to build tour packages from scratch, have brochures prepared, and then sell the packages. After performing as Continental's sales representative for about two years, Williamson was again promoted, this time to the position of sales manager in Oregon. In this capacity, he was responsible for sales representatives in a three-state area. In addition to budget control, he was responsible for passenger and cargo sales, charter sales, and was in charge of the Portland ticket office and operations for approximately two and a half years.

He resigned from Continental Airlines to become general manager of a travel agency. When he left Continental Airlines, Williamson was earning approximately $1,250 a month. He later became sales manager for Gray Line Sightseeing Tours and assisted in getting another travel agency started from scratch.

While these facts demonstrate that Williamson's job-related work experience was far superior to Higdon's, they do not necessarily show that the use of experience as a factor was business related. This fact is shown, however, by the testimony of Mr. Ward Eason, the Evergreen president, on direct examination by Mr. Hyams:

"Q In 1976 when Gary Williamson came to work at Evergreen International Airlines, what type of people were needed in that position?

A Well there's a lot of work activity that has to be performed in an airline. And so in order to keep the operation 'lean-and-mean,' so to speak, you need to have individuals who have a capability of wearing a number of hats. And this is the type of individual we're looking for. All the people that we brought with us

were being called upon to perform any number of different functions in order to make it, to cover all bases necessary.

Q Did you hire Gary Williamson for the airline?

A Yes.

Q Why?

A We hired Gary initially as a salesman. And he met the criteria of character and abilities, personality-wise and everything else—he was an outgoing individual, that was the type of individual he was. He had the experience of an airline background and that was the experience that was required.

And he really fit the model of an individual that was capable of handling more than one task.

Q Did Gary take on later functions besides salesman?

A Shortly after he came aboard with us, and his family was still in Portland, we had him on board the facility there in apartment housing, we got to know Gary pretty well. And learned of his other capabilities which were not what we had been looking for in our initial search. We were looking for a salesman. And the need, the requirement for Customer Services was becoming imminent. He filled the bill, he was selected for that position.

* * * * * *

Q What did you have Gary do for you from the time he came to work for Evergreen International Airlines until the time he left?

A He did any number of jobs. He worked initially, as I said, in a sales capacity. He also worked as a—with contracts, in the marketing administration section of the operation, which was taking the quotes and putting them into contracts and building contracts and setting up the programs at the same time.

These tasks have all been more specifically assigned as the time has gone on. But he would actually carry, from the time that we got a response, a positive response from a customer, he carried it right on into the execution of the operation.

Q Did he have the travel industry experience?

A Certainly he had it. I believe he had been with Continental, I think, at least ten years.

Q In your estimation, was travel agency experience necessary and relevant to those kinds of jobs?

* * * * * *

Q Was travel experience relevant and necessary?

A Oh, definitely.

Q For Gary's function that he performed?

A Yes.

Q Now, Gary, you pointed out that Gary was the director of Passenger Services in 1976. Under what circumstances did that take place?

A It was probably best described as kind of a metamorphosis, that as individual capabilities developed or came forth, the jobs were assigned to them. And they would actually get into working a particular function, and then at some point someone would say, 'Hey, let's put a title on this or call it something.'

The changes were taking place quite rapidly. And so exactly what time span that happened, I don't recall. But that all kind of worked in together.

Q Would you say it was progressive in nature from Gary going to [sic] the marketing to the director of Passenger Services?

A Well, yes."

No evidence contradicts this testimony and it is supported by the entire record.

It is also supported by the evidence pertaining to the hiring of Higdon's replacement in 1979. Evergreen hired a female, Beth Westford, who had travel industry experience comparable to Williamson's. She was hired initially at $1,350 per month. She first worked for Northwest Airlines as a reservations sales agent in 1967 and 1968. In this capacity, she took telephone reservations and planned trip itineraries for passengers. After working briefly for a travel agency, Westford went to work for

Trans International Airlines (T.I.A.). She worked for one year as T.I.A.'s passenger service representative at the Oakland airport. In this capacity, she was in charge of checking in and processing passengers, ramping the aircraft, and supervising caterers, cleaners, and ground handlers. Thereafter, she was promoted to a supervisory position in the special programs department, in charge of all aspects of 'special deluxe flights.' In this position, Westford was T.I.A.'s sole representative for flight departures and arrivals at airports in the United States, Canada, and South America. Her specific duties included overseeing passenger check-in procedures, documentation, ramping of aircraft, catering, and working with ground handlers and other airlines that were providing services for T.I.A. At the same time, she continued to be a representative for trip flight departures. Westford continued in that supervisory capacity at a salary of $1,200 a month until she left to begin her employment with Evergreen.

Westford testified that many of the job duties with Evergreen were identical to her duties with T.I.A. According to Westford, her prior experience was extremely valuable in the performance of her job duties at Evergreen.

There was also evidence of Evergreen's compensation policy supporting the requested findings. Three management people were involved in the determination of each employee's salary. One of those individuals was a woman, Evergreen vice president Phoebe Hockens. Another was the company's president, Ward Eason. Eason testified that in setting an individual's compensation, Evergreen evaluated that person's abilities and what might be expected from him in terms of production. He also explained that an applicant's past experience in the airline industry was considered significant in making salary determinations.

Thus, Williamson's salary took into account that he "had the experience of an airline background" and "fit the model of an individual that was capable of handling more than one task." And Westford's salary was higher than Higdon's because of her experience in the industry. When Evergreen hired Westford for the position, the company decided it needed her because it was falling behind in its records, and she was considered the most capable candidate available. Beth Westford, according to Eason, was the best talent available for the job that needed to be done and the company paid the price necessary in the marketplace to get her.

We have carefully searched the entire record attempting to find support for the trial court findings. We find none. We have considered the trial court's ability to see and hear the witnesses. We cannot believe this explains the clearly erroneous result.

The record does not sustain a sex discrimination result.

Reversed and remanded with directions. The appellee's motion for attorney fees on appeal is denied.

HOWARD and FERNANDEZ, JJ., concur.